[Nos. 61645-1; 61268-4. En Banc. November 16, 1995.]
SCOTT SHERMAN, M.D., ET AL., *Respondents*, v. THE STATE OF WASHINGTON, ET AL., *Appellants*.

*Edwards, Sieh, Hathaway, Smith & Goodfriend,* by *Howard M. Goodfriend* and *Catherine Wright Smith*; *Heller, Ehrman, White & McAuliffe,* by *Patricia H. Wagner; Christine O. Gregoire, Attorney General, Narda D. Pierce, Solicitor General,* and *William L. Williams* and *William B. Collins, Assistants,* for appellants.

*Mary C. Kinerk* and *Laurie A. Kinerk,* for respondents.

PEKELIS, J. — This appeal stems from the decision of the University of Washington School of Medicine (the University) to terminate Dr. Scott Sherman, Respondent,

from its anesthesiology residency program. It is undisputed that Dr. Sherman became chemically dependent on anesthetic narcotics while a resident in the program. Following an incident that raised the suspicion that Dr. Sherman may have used anesthetic narcotics while treating a patient, the University decided to terminate him.

Pursuant to the Washington Administrative Procedure Act (WAPA), RCW 34.05.001-.902, Dr. Sherman brought an action in superior court challenging the University's termination order. He also moved to disqualify the entire Office of the Attorney General from representing Appellants in this proceeding. The trial court granted this motion. Dr. Sherman later added a number of statutory and common law damages claims, including breach of contract, handicap discrimination, and retaliatory discharge, against the State of Washington, the University of Washington School of Medicine, Dr. Thomas Hornbein, Dr. Bruce C. Gilliland, and President William Gerberding (collectively Appellants).

Without ever reaching the merits of the University's termination decision, the trial court granted summary judgment to Dr. Sherman on each of these claims and vacated the University's termination order. Based upon these rulings, the trial court awarded Dr. Sherman almost $900,000 in compensatory damages, punitive damages, and attorneys' fees and costs. Appellants appeal from the summary judgment. In addition, the Attorney General appeals from the trial court's order disqualifying the entire Office of the Attorney General from representing Appellants.

We reverse each of these orders and remand for trial Dr. Sherman's claims of federal and state handicap discrimination, breach of contract, and retaliatory discharge.

## FACTS

### A. Dr. Sherman's Background

In 1985, Dr. Sherman entered the anesthesiology

residency program at the University of Washington School of Medicine. The relationship between Dr. Sherman and the University was governed by a contract known as the "University of Washington School of Medicine Graduate Medical Education Program, Residency Position Appointment Agreement" (RPAA). (Clerk's Papers at 8969.) By virtue of signing the RPAA, Dr. Sherman was also bound by the University of Washington Housestaff Policy Agreement (HSPA), which sets forth the procedures applicable to termination proceedings. (Clerk's Papers at 8963-66.)

During his residency, Dr. Sherman began using intravenous narcotics. He soon became addicted to synthetic opiates, such as fentanyl and sufentanil, which are commonly used in anesthesiology.

In 1987, the University learned that Dr. Sherman had been diverting anesthetic narcotics for his own use. With the assistance of the Washington Monitored Treatment Program (WMTP),[1] the University arranged for an intervention. As a result, Dr. Sherman resigned from the residency program and received treatment for his chemical dependency. He was later readmitted to the program on the condition that he receive long-term treatment from the WMTP.

In September 1988, Dr. Sherman reported a single incident of relapse to Dr. Thomas Hornbein, chair of the Department of Anesthesiology. Dr. Sherman, however, was allowed to remain in the residency program, intensifying his participation in the chemical dependency treatment program.

Prior to July 14, 1989, Dr. Sherman's residency program performance had been consistently evaluated as satisfac-

---

[1]The WMTP, created by RCW 18.71.320, was established to assist with the identification, intervention, follow-up, and monitoring of physicians with illnesses of impairment, such as chemical dependency. The WMTP provides a participating physician with group counseling, chemical monitoring, and individual treatment.

tory and he had been encouraged by others, including Dr. Hornbein, to join the faculty after graduation.

### B. July 14, 1989, Operating Room Incident

On July 14, 1989, Dr. Bruce S. Gillies, one of Dr. Sherman's instructors, was supervising Dr. Sherman as he administered anesthesia to a surgery patient. Dr. Sherman was then in the last year of the residency program. According to Dr. Gillies, he had just returned to the operating room after a short break when he happened upon Dr. Sherman, "huddled" next to the operating table drape and holding a syringe. (Clerk's Papers at 9016.) When Dr. Gillies asked what he was doing, Dr. Sherman replied that he was "just flushing" the intravenous (IV) tube. (Clerk's Papers at 9016-18.) Dr. Gillies noticed, however, that Dr. Sherman was holding a syringe with a thirty-gauge needle, which Dr. Gillies believed was too small to accomplish this, and he asked Dr. Sherman about this. According to Dr. Gillies, "Dr. Sherman abruptly pulled the needle off the syringe, attached the syringe to the stopcock of the patient's intravenous line, and pushed whatever was in the syringe into the patient." (Clerk's Papers at 9016.) Dr. Gillies also observed a drop of blood on Dr. Sherman's left wrist near the " 'anatomical snuff box,' " an area where addicts frequently inject drugs. (Clerk's Papers at 9016.)

After telling Dr. Sherman that he was going to lunch, Dr. Gillies looked back through the operating room window and saw that Dr. Sherman was again huddled next to the operating table drape looking down at his hands. When he returned approximately ten minutes later, Dr. Gillies noticed a piece of gauze with a drop of blood on it and some increased redness on Dr. Sherman's left wrist as if he had been rubbing it.

Following the incident, Dr. Sherman informed Dr. Gillies that he had disposed of, or "wasted," an unused portion of the narcotic sufentanil. One month prior, the University had posted a policy requiring the return of any

unused narcotics to the pharmacy. In the event this could not be done, it was to be disposed of in the presence of a witness and both individuals were to sign a written record of the disposal. Before June 1989, however, the University had not strictly enforced this policy.

Dr. Gillies reported the incident to Dr. Hornbein, who confronted Dr. Sherman. According to Dr. Hornbein, Dr. Sherman's "immediate, intense response was to deny that there was a problem . . . ." (Admin. R. at 473.) When Dr. Hornbein expressed surprise that Dr. Sherman had wasted narcotics without a witness, Dr. Sherman responded that " 'this was not a very clearly communicated expectation.' " (Admin. R. at 475.) Dr. Sherman also "expressed dismay" that Dr. Richard Irons, the WMTP medical director, had not informed him of behavior that would minimize the risk of being questioned about his status. Within an hour, Dr. Sherman provided two separate urine specimens for testing. Although there is a dispute as to where the samples were tested and as to who received the results, it is undisputed that the results of the testing were negative. It is also undisputed that a negative urine test result is inconclusive for determining use of the drugs in question.

### C. Dr. Hornbein's Decision
### To Terminate Dr. Sherman

Following several meetings with his associates, including members of the anesthesiology department executive committee and Dr. Irons of the WMTP, Dr. Hornbein became convinced that Dr. Sherman had not satisfactorily assumed personal responsibility for his chemical dependency and that his remaining in the program posed a potential risk to patients and himself.

Dr. Hornbein and Dr. John H. Lecky, chief of the anesthesia service and associate medical director of the University of Washington hospital, then met with Dr. Sherman. Dr. Hornbein tried to encourage Dr. Sherman to resign and pursue a specialty that did not involve the administration of anesthetics. Dr. Sherman reiterated that

he felt that the WMTP and Dr. Irons had let him down because he had not been cautioned about which behaviors to avoid, such as wasting narcotics without a witness. Dr. Sherman's reaction confirmed for Drs. Hornbein and Lecky that he was not taking responsibility for his dependency and that their previous decision to terminate was appropriate.

Dr. Sherman later decided to challenge his termination, formally invoking the administrative review process under the HSPA and requesting that Dr. Hornbein provide a written statement of the reasons for the termination. On January 12, 1990, Dr. Hornbein formally terminated Dr. Sherman by letter.[2] Dr. Hornbein explicitly stated that his decision to terminate Dr. Sherman was not based on whether he had used narcotics during the July 14, 1989, incident but on the manner in which Dr. Sherman responded once the issue of substance abuse had been raised.

Specifically, Dr. Hornbein concluded that Dr. Sherman had "failed to assume personal responsibility for [his] problem in a manner that provided assurance to those overseeing [his] training that [he was] capable of coping with [his] substance abuse problem within the context of this particular specialty." (Clerk's Papers at 719.) Dr. Hornbein based this conclusion on four factors: (1) Dr. Sherman's disposal of narcotics without a witness in violation of University policy; (2) Dr. Sherman's placement of the blame for this violation on the WMTP's failure to inform him of behaviors that would put him above suspicion; (3) Dr. Sherman's statement that such behaviors were for the purpose of satisfying others, rather than for his own rehabilitation; and (4) the exceptionally high risk of relapse for chemically dependent physicians who reenter the anesthesiology specialty where narcotics are uniquely accessible. (Clerk's Papers at 721-22.)

On January 27, 1990, Dr. Hornbein, who was responsible

---

[2]Although Dr. Sherman was removed from his clinical duties, he remained in the residency program and received his salary until October 1990.

for regular reports to the American Board of Anesthesiology, reported that Dr. Sherman's character was unsatisfactory for the practice of anesthesiology.

Dr. Hornbein received legal advice in this matter from Assistant Attorney General Steve Milam (AAG Milam) of the University of Washington health sciences and hospitals section of the Attorney General's office.

### D. Housestaff Committee Hearing

On April 12-13, 1990, the University's Housestaff Committee (Housestaff Committee), a formal review body consisting of four faculty members and four residents, held an adjudicative hearing to review Dr. Hornbein's termination decision. Dr. Lecky, whose background in substance abuse included serving as chair of the University of Pennsylvania Substance Abuse Committee, testified at the hearing. In Dr. Lecky's personal and professional opinion, Dr. Sherman's behavior evidenced denial, which indicated that he was not recovering effectively from his chemical dependency and that he should not continue in the anesthesiology specialty. He also testified about his role in having Dr. Sherman's two urine samples tested, that the test results were negative, and that urine testing for narcotic opiates, such as sufentanil and fentanyl, is "irrelevant" because those narcotics do not appear in urine. (Admin. R. at 666.) Unbeknownst to anyone at that time, Dr. Lecky had a chemical dependency.

On April 13, 1990, after deliberations, the Housestaff Committee unanimously concluded that Dr. Hornbein had properly considered Dr. Sherman's chemical dependency in deciding to terminate him and that Dr. Hornbein's termination decision was not arbitrary or capricious. The committee also reviewed the termination decision applying a de novo standard of review. Under this standard, five of the eight committee members concluded that Dr. Hornbein's termination decision was the proper one. Dr. Johan Verhulst, the committee chair, prepared and circulated a draft majority opinion.

The Housestaff Committee received legal advice in this matter from Assistant Attorney General Mark Green (AAG Green) of the University of Washington health sciences and hospitals section of the Attorney General's office.

### E. The "Errant Fax" Transmission

At an April 23, 1990, meeting of the Housestaff Committee, Dr. Richard Zager, a majority member, drafted a concurring opinion that would uphold the termination solely on the basis that Dr. Sherman had failed to properly dispose of the narcotics. Dr. Verhulst suggested that Dr. Zager consider the matter overnight and, if he still wished to concur, to fax a copy to him the next day. The next day, as requested, Dr. Zager instructed his secretary to fax a copy of the draft concurring opinion to Dr. Verhulst. His secretary, however, mistakenly faxed a copy to Dr. Hornbein's office instead (hereinafter the "errant fax"). As fate would have it, Dr. Peter Colley happened to be waiting for a fax at Dr. Hornbein's fax machine when the errant fax was transmitted. Dr. Colley, who had testified at the Housestaff Committee hearing in opposition to Dr. Sherman's termination, scanned the errant fax and then called Laurie Kinerk, one of Dr. Sherman's attorneys. He informed her that he had seen what appeared to be a copy of the committee's report on Dr. Hornbein's fax machine.

Later that day, Dr. Hornbein read the errant fax and, not knowing what to make of it, called Dr. Lecky and briefly discussed it with him. Dr. Hornbein reported the errant fax to Assistant Attorney General Milam but did not report it to anyone else. On April 25, 1990, Dr. Verhulst learned that Dr. Zager's secretary had mistakenly faxed the draft concurring opinion to Dr. Hornbein. Upon learning of the errant fax, Dr. Verhulst reported it to Assistant Attorney General Green but did not report it to anyone else.

At this point, Assistant Attorneys General (AAGs) Milam and Green both knew that the draft concurring

opinion of Dr. Zager had mistakenly been sent to Dr. Hornbein, but neither informed Laurie Kinerk. Kinerk, on her part, did not inform either assistant attorney general that she knew that a copy of an opinion had been sent to Dr. Hornbein.

On May 1, 1990, the Housestaff Committee sent its final report and recommendation, including Dr. Zager's concurring opinion, to Dr. Bruce C. Gilliland who, as acting dean of the School of Medicine, was the chief adjudicative officer charged with the final decision.

On May 8, 1990, Colleen Kinerk, another of Dr. Sherman's attorneys, sent a letter to Dr. Gilliland and President Gerberding, informing them for the first time that Dr. Zager's concurring opinion had been faxed to Dr. Hornbein ten days before the committee had issued its report. Colleen Kinerk maintained that the errant fax constituted an impermissible ex parte communication that violated due process and rendered the hearing invalid. In response, Dr. Gilliland returned the committee's report to Dr. Verhulst with instructions to investigate the circumstances surrounding the errant fax.

As part of his investigation, Dr. Verhulst contacted Dr. Zager, who learned for the first time of his secretary's error in faxing the draft concurring opinion. Dr. Zager informed Dr. Verhulst that he had not spoken with Dr. Hornbein before or after the committee hearing. Dr. Verhulst then submitted a report to Dr. Gilliland, in which he stated in part:

> I do not believe that the facts support the allegation of unfairness or failure of due process, or that they support an allegation of improper *ex parte* communication or contact. What occurred here was, at most, an inadvertent premature disclosure of one portion of the recommendation with absolutely no affect [*sic*] on the outcome.

(Clerk's Papers at 85.)

On May 23, 1990, Dr. Sherman filed an action seeking superior court intervention and a preliminary injunction

enjoining the termination proceedings because of the errant fax. The court denied Dr. Sherman's motion for a preliminary injunction and stayed any further judicial review until completion of the administrative process.

At this point, Dr. Gilliland referred the matter of the errant fax to the Office of Administrative Hearings for ancillary proceedings to investigate Dr. Sherman's allegations that Dr. Verhulst's investigation was orchestrated and biased and that the participants were conspiring against him. Following a hearing, an administrative law judge (ALJ) concluded that the errant fax had been sent to Dr. Hornbein inadvertently and that it did not constitute an ex parte communication under the WAPA, RCW 34.05.455. The ALJ also made a number of findings supporting his conclusion that the actual conduct of the committee hearing and the process by which the committee reached its decision comported with fairness and due process. Nevertheless, the ALJ found that AAGs Milam and Green had violated an ethical obligation to promptly reveal the errant fax to Dr. Sherman and thereby concluded that this act had violated the appearance of fairness and deprived Dr. Sherman of due process, hence tainting the entire process. For this reason, he recommended that the committee's decision be vacated.

## F. The University's Final
## Decision To Terminate

The ALJ's findings and conclusions were reviewed by Dr. Gilliland, the ultimate adjudicative officer. Dr. Gilliland, who was not bound by the ALJ's findings and conclusions from the ancillary proceeding, see RCW 34.05.461(2), essentially adopted all of the ALJ's factual findings but disagreed with the conclusion that AAGs Milam and Green had an ethical duty to report the errant fax to Dr. Sherman. Additionally, because Dr. Gilliland concluded, as had the ALJ, that the errant fax had no effect on the committee's decision, he concluded that the proceeding had not been tainted. In so concluding, Dr. Gilliland noted

that Laurie Kinerk knew of the errant fax even before AAGs Milam and Green, and moreover, she had not brought it to the attention of University officials until after the committee released its report.

Dr. Gilliland received legal advice in this matter from Senior Assistant Attorney General Lloyd Peterson (AAG Peterson) of the University of Washington health sciences and hospitals section of the Attorney General's office. AAG Peterson was the supervisor of AAGs Milam and Green.

## G. Superior Court Proceedings

On October 30, 1990, Dr. Sherman filed an action for judicial review of the termination decision under the WAPA, RCW 34.05. He later added various civil claims including breach of contract, federal and state handicap discrimination, retaliatory discharge, and violation of his civil rights under 42 U.S.C. § 1983. In addition to compensatory damages, punitive damages, and attorneys' fees and costs, Dr. Sherman sought reinstatement and a retraction of Dr. Hornbein's report to the American Board of Anesthesiology.

### 1. Order Disqualifying the Attorney General's Office

Initially, Dr. Sherman moved to disqualify the Attorney General's office both because of the errant fax incident and because of an alleged conflict of interest arising from AAG Milam's representation of Dr. Sherman in an earlier malpractice claim of Ayesha Beasley, in whose treatment Dr. Sherman had been involved.

In June 1989, the University's claims office was investigating this possible claim, and, pursuant to this investigation, AAG Milam sent a standard form memorandum to, among others, Dr. Sherman, requesting a first-hand, detailed description of the incident. Dr. Sherman provided the requested narrative, but AAG Milam did not have any further contact with Dr. Sherman regarding this matter.

In November 1990, a suit was filed in the Beasley matter, naming Dr. Sherman as a defendant. Because one of Dr. Sherman's attorneys had questioned the propriety of

AAG Milam's involvement in the Beasley matter in light of the termination proceedings, a private attorney general was selected to represent the University in the case.

Upon notification that the University would assume responsibility for Dr. Sherman's actions, Beasley agreed to dismiss Dr. Sherman from the suit.

On November 27, 1991, the trial court granted Dr. Sherman's motion to disqualify the entire Attorney General's office from representing Appellants. The trial court concluded that AAG Milam had breached an ethical duty by agreeing to serve as Dr. Hornbein's counsel in the termination action, stating that "[t]his simultaneous representation by Mr. Milam and associate attorneys in his office tainted the termination action and also resulted in inadequate protection of Dr. Sherman's legal rights in *Beasley*." (Clerk's Papers at 281.) In addition, the trial court concluded that AAG Peterson, who supervised AAGs Milam and Green, should have withdrawn as legal counsel to Dr. Gilliland and the University because a conflict of interest arose once the ALJ concluded that AAGs Milam and Green had an ethical duty to disclose the errant fax. The court noted, however, that none of the AAGs had intentionally committed any ethical violations.

The trial court denied Dr. Sherman's motion for reinstatement pending judicial review.

## 2. Summary Judgment on WAPA Claim and Order Vacating the Termination Decision

On December 14, 1992, the trial court issued a letter order granting Dr. Sherman's motion for summary judgment on his WAPA claim and his motion to vacate the termination order. In its March 15, 1993, findings and conclusions, the trial court found six procedural irregularities, which it determined established "an inherent lack of due process which provides grounds . . . to grant [Dr. Sherman's] motion to vacate the agency order of termination under RCW 34.05.570(3)(a) and (c)." (Clerk's Papers at 2001.)

First, the trial court found that the failure of AAGs Mi-

lam and Green to disclose the errant fax violated Dr. Sherman's due process rights, Rule of Professional Conduct (RPC) 3.4, and the appearance of fairness doctrine.

Second, the trial court found that Dr. Sherman's procedural due process rights had been violated because a conflict of interest arose that required AAG Peterson to withdraw as legal counsel to Dr. Gilliland and the University once the ALJ concluded that his subordinates, AAGs Milam and Green, had breached an ethical duty to disclose the errant fax.

Third, the trial court found that after Dr. Sherman filed his action in superior court, under the Code of Judicial Conduct and the appearance of fairness doctrine, Dr. Gilliland should have disqualified himself from serving as the chief adjudicative officer in the termination proceeding because he also served as the University's representative in the superior court litigation.

Fourth, the trial court found that Drs. Hornbein and Lecky had failed to disclose that a portion of Dr. Sherman's urine specimen had been tested at out-of-state laboratories for sufentanil and fentanyl and that the results were negative. In addition, the trial court found that Drs. Hornbein and Lecky had testified at the Housestaff Committee hearing, contrary to the facts, that no specific tests for sufentanil and fentanyl had been conducted. The trial court concluded that the "withholding of evidence regarding the testing of the urine specimens and misrepresentations regarding the evidence" constituted a due process violation and rendered the decision-making process unlawful. (Clerk's Papers at 2004.)

Fifth, the trial court found that Dr. Hornbein and AAG Milam's failure to timely disclose Dr. Lecky's chemical dependency constituted a due process violation and rendered the decision-making process unlawful.

Sixth, the trial court found that AAG Milam's "simultaneous representation" of Dr. Sherman in the Beasley matter and of Dr. Hornbein in the termination proceeding constituted a due process violation. (Clerk's Papers at 2005.)

The trial court concluded that Dr. Sherman had been "substantially prejudiced by the multiple violations of his due process rights" and had not received "a hearing fair in fact and fair in appearance." (Clerk's Papers at 2006.) The trial court concluded that "[t]here is no just reason for delay of entry of judgment of invalidity of the agency Order of Termination since it was issued in violation of the state and federal constitutions and was the product of an illegal decision-making process in derogation of RCW 34.05.570(3)(a) and (c)." (Clerk's Papers at 2007.) The trial court also determined that a new hearing would not adequately compensate the Plaintiffs and hence that the proper remedy was simply reversal and reinstatement. The trial court reserved Dr. Sherman's remaining causes of action and determination of damages for later adjudication.

### 3. Summary Judgment on Breach of Contract, Handicap Discrimination, and Retaliatory Discharge Claims

On August 9, 1993, apparently based on the earlier decision regarding procedural due process violations, the trial court granted Dr. Sherman's motion for summary judgment on his claims of breach of contract, handicap discrimination, and retaliatory discharge, concluding that there were no genuine issues of material fact and that Dr. Sherman was entitled to judgment as a matter of law. The trial court scheduled the damages hearing to begin on August 20, 1993.

### 4. Denial of Motion for Recusal and Vacatur

In the course of preparing for the damages hearing, Appellants' counsel discovered an entry in the WMTP's chart notes indicating that the trial court's judicial extern had contacted the WMTP with questions "regarding urine/drug monitoring for physicians in [the] program, in particular as it pertains to Scott Sherman." (Clerk's Papers at 9469.)

Appellants then moved that the trial court recuse itself and vacate all rulings that had been made since the ex

parte contact. Following a hearing on the motion, the trial court granted the motion for recusal but denied the motion to vacate its prior rulings. Pursuant to a motion for reconsideration, however, the trial court reversed itself and ruled that recusal was unnecessary.

5. Damages Award

Having determined that Appellants had no right to a jury trial on the issue of damages, on January 25, 1994, pursuant to RCW 34.05 (WAPA), § 504 of the Rehabilitation Act of 1973, and RCW 49.60 (Washington Law Against Discrimination (WLAD)), the trial court assessed $152,167 in compensatory damages against them.

In awarding damages under WAPA, the trial court concluded that RCW 34.05.574(3) provided an "independent basis" for all relief awarded, reasoning that the statute did not require the matter to be remanded for a new termination proceeding where it "would be impracticable and would cause unnecessary delay and would not adequately compensate the plaintiffs for the damages sustained as a result of the wrongful discharge and the other intentional and wrongful acts of defendants." (Clerk's Papers at 3378.)

Pursuant to 42 U.S.C. § 1983, the trial court assessed $148,667 in punitive damages individually against Dr. Hornbein, Dr. Gilliland, and the University based on its conclusion that each had acted with "reckless disregard" of Dr. Sherman's constitutional and federal statutory rights. (Clerk's Papers at 3387, 3391, 3395.) The trial court predicated § 1983 liability on its "prior adjudications of statutory, constitutional and due process violations by the defendants, together with the evidence presented at the August 1993 hearing on damages and remedies . . . ." (Clerk's Papers at 3387.)

In addition, the trial court found that its order granting summary judgment to Dr. Sherman on his federal and state handicap discrimination claims provided an independent basis for a § 1983 punitive damages award. The trial court also assessed punitive damages against Dr. Hornbein and Dr. Gilliland pursuant to RCW 49.60.

The trial court assessed $596,536.63 in attorneys' fees and costs against Appellants pursuant to (1) 42 U.S.C. § 1988 on the basis that Dr. Sherman was the prevailing party under § 1983 and § 504 of the Rehabilitation Act of 1973; (2) RCW 49.60 (WLAD); and (3) RCW 49.48 on the basis that Dr. Sherman prevailed on his common law causes of action for breach of contract and wrongful discharge.[3]

The trial court also ordered the University to purge Dr. Sherman's records of any and all defamatory statements and to retract Dr. Hornbein's January 1990 report to the American Board of Anesthesiology concerning Dr. Sherman's unsatisfactory performance.

We allowed direct appeal of the trial court's judgment and disqualification order to this court.

## ANALYSIS

### A. Procedural Due Process

Appellants first contend that the trial court erred in granting summary judgment to Dr. Sherman on his WAPA claim and in vacating the University's termination decision based upon its conclusion that Appellants had committed acts in the course of the termination proceedings that violated procedural due process.

■■ When reviewing a summary judgment order, this court engages in the same inquiry as the trial court. *See, e.g., Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). A summary judgment order will be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Mountain Park Homeowners*, 125 Wn.2d at 341. All facts and reasonable inferences therefrom are viewed in the light most favorable to the nonmoving party; all questions of law are reviewed de novo. *Mountain Park Homeowners*, 125 Wn.2d at 341.

---

[3]We note that the record is devoid of any order granting summary judgment to Dr. Sherman on a wrongful discharge claim.

Questions of fact may be determined as a matter of law only when reasonable minds could reach but one conclusion from them. *See, e.g., Ruff v. County of King*, 125 Wn.2d 697, 703-04, 887 P.2d 886 (1995).

■ Due process is a flexible concept, requiring "such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)); *accord Morris v. Blaker*, 118 Wn.2d 133, 144, 821 P.2d 482 (1992). The fundamental requirement of due process is notice and the opportunity to be heard. *Mathews*, 424 U.S. at 333; *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 768, 871 P.2d 1050, *cert. denied*, 115 S. Ct. 663 (1994). So long as the party is given adequate notice and an opportunity to be heard and any alleged procedural irregularities do not undermine the fundamental fairness of the proceedings, this court will not disturb the administrative decision.

The trial court in this case elevated six minor procedural irregularities to the level of due process violations and, as a result, invalidated the University's termination decision and awarded damages without ever reaching the merits. Because none of these six instances actually affected Dr. Sherman's due process rights, we conclude that the hearing was procedurally valid and that vacation of the University's termination decision on this basis was unjustified. We analyze each of these procedural irregularities in turn.

1. AAGs Milam and Green's Failure To Reveal the Errant Fax

In holding that Dr. Sherman's right to due process had been violated by AAGs Milam and Green's failure to disclose the errant fax to Dr. Sherman, the trial court concluded that the AAGs had violated RPC 3.4. RPC 3.4 provides:

A lawyer shall not:

(a) Unlawfully obstruct another party's access to evidence

or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act; . . .

■ ■ The trial court, however, never explained the "potential evidentiary value" of the errant fax. The errant fax was of no consequence to the Housestaff Committee's decision-making process. It was simply an innocent clerical mistake. Dr. Hornbein mistakenly received the fax several days before the committee actually released its report, but only after the committee had made its decision and all opinions had been drafted. Dr. Zager's concurring opinion appeared in the committee's report in essentially the same form as when he had originally presented it at the April 23, 1989, committee meeting. There is simply no evidence or even a claim that the errant fax incident had *any* effect on the decision-making process. Also, it is worth noting that RPC 3.4 does not itself create a duty of disclosure. *See* 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT 626-27 (Supp. 1992). On its face, the rule merely requires the preservation of records—presumably for disclosure should such a duty arise from another source. The AAGs did not alter, destroy, or conceal the errant fax; they merely failed to volunteer information that had no apparent evidentiary value.[4] Moreover, the record shows that Dr. Sherman's attorneys knew of the errant fax before either AAG Milam or AAG Green.

■ In conclusion, while it may have been prudent to reveal the clerical error to Dr. Sherman's counsel, Dr. Sherman was in no way prejudiced by the AAGs' failure to do so. Not only did Dr. Sherman's counsel know of the transmission, we are convinced that nothing about the error deprived Dr. Sherman of procedural due process.

---

[4]The trial court also concluded, like the ALJ, that the AAGs' conduct violated the appearance of fairness doctrine. We note, however, that the appearance of fairness doctrine applies to the acts of administrative bodies, not to the conduct of individual attorneys. *See, e.g., Narrowsview Preservation Ass'n v. City of Tacoma,* 84 Wn.2d 416, 420, 526 P.2d 897 (1974).

## 2. AAG Peterson's Continued Representation of Dr. Gilliland After the Errant Fax Incident

The trial court concluded that once ALJ Skeel issued his decision concerning the errant fax, a conflict of interest arose that precluded AAG Peterson from continuing to advise Dr. Gilliland, the person with the authority to accept or reject the ALJ's determination. The court reasoned that the ALJ's decision made the conduct of AAGs Milam and Green, whom AAG Peterson supervised, "an integral issue in the adjudicative process which culminated in the issuance of the final agency order." (Clerk's Papers at 2001.)

In previously addressing the need for effective screening mechanisms within the Attorney General's office, we have stated:

> When the performance of any legal duties required of the Attorney General presents actual conflicts of interest, a different assistant attorney general can, and should, be assigned to handle those inconsistent functions . . . . [W]hen the dual roles of the Attorney General present such a conflict, two separate attorneys should handle those functions.

*Washington Medical Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 480-81, 663 P.2d 457 (1983).

■ The court of appeals applied these principles in *Amoss v. University of Washington*, 40 Wn. App. 666, 700 P.2d 350 (1985), a case also involving the University of Washington division of the Attorney General's office. There, the dean of the College of Arts and Sciences appealed to the University president the tenure committee's decision to reconsider a tenure denial. *Id.* at 672. In a situation much like the one here, an assistant attorney general represented the dean as an adversary, while another assistant attorney general, who supervised the dean's counsel, represented the University president. *Id.* at 672-73. The two assistant attorneys general, however, kept separate files and did not confer about the matter with each other. *Id.* at 686. The court noted these procedures

with approval and concluded that there had been no impropriety or violation of the appearance of fairness doctrine.

A screening mechanism consistent with these approved procedures was employed in this case. AAG Milam served as legal counsel to Dr. Hornbein, AAG Green served as legal counsel to the Housestaff Committee, and AAG Peterson served as legal counsel to Dr. Gilliland and the University. Each AAG maintained separate files, and none conferred about the matter with the others.

■ Dr. Sherman does not argue that *Johnston* or *Amoss* is incorrect, but rather asserts that the alleged ethical misconduct of the two subordinate AAGs in this case collapsed this screen. However, no authority is cited for the proposition that a supervisor is disqualified from any matter in which the conduct of a subordinate is at issue. Nor are we able to discern a reason to create such a rule. The screening mechanism in place prevented AAG Peterson from participating in, or approving of, the conduct of AAGs Milam and Green. As a result, AAG Peterson's performance as a supervisor was not implicated and he would not have a conflict of interest in evaluating his subordinates' conduct. Moreover, the ultimate issue for Dr. Gilliland to resolve was the *effect* of the AAGs' nondisclosure on the fairness of the process. The issue was one of law— whether the AAGs' conduct, the substance of which was not in dispute, tainted the entire proceeding. As discussed above, it clearly did not. There is no contention that AAG Peterson did any more than assist Dr. Gilliland in reaching this correct conclusion.

3. Dr. Gilliland's Failure To Disqualify Himself from Issuing the University's Final Order

The trial court concluded that Dr. Gilliland should have been disqualified from serving as the chief adjudicative officer in the termination hearing because he also served as the University's designated representative in Dr. Sherman's lawsuit. After the Housestaff Committee issued its report but before Dr. Gilliland issued his final decision,

Dr. Sherman initiated a superior court action attempting to enjoin the termination proceedings. President Gerberding then wrote to Dr. Gilliland requesting that he serve as the University's representative in this litigation.

In support of its ruling, the trial court relied upon the Code of Judicial Conduct (CJC), RCW 34.05.425, and the appearance of fairness doctrine. Canon 3(C) of the CJC provides that judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned. RCW 34.05.425(3) provides that a "presiding officer is subject to disqualification for bias, prejudice, interest, or any other cause provided in this chapter or for which a judge is disqualified." The appearance of fairness doctrine requires that an administrative body must be fair, free from prejudice, and have the appearance of impartiality. *See, e.g., Narrowsview Preservation Ass'n v. City of Tacoma*, 84 Wn.2d 416, 420, 526 P.2d 897 (1974).

■ The trial court apparently based its conclusion upon its finding that Dr. Gilliland was "an opposing party in another pending legal proceeding . . . ." (Clerk's Papers at 2002.) However, it was not a separate legal proceeding in which Dr. Gilliland was a party. Dr. Gilliland was no more a party to another proceeding than would be a trial court judge who is the subject of an extraordinary writ or motion for discretionary review before the entry of final judgment. To require disqualification in such circumstances would be to allow a party to invalidate or halt any administrative proceeding merely by filing a suit against the agency and its officers. Thus, the trial court erred in concluding that Dr. Gilliland should have disqualified himself from issuing the University's final order.

4. Existence of an Attorney-Client Relationship Between AAG Milam and Dr. Sherman

The trial court ruled that by representing Dr. Hornbein in the termination proceedings, AAG Milam violated RPC 1.7 and RPC 1.9 and denied Dr. Sherman his right to due process. This was based on the trial court's conclusion that AAG Milam and Dr. Sherman had previously estab-

lished an attorney-client relationship in connection with the Beasley medical malpractice claim.

The existence of an attorney-client relationship may be implied based largely upon the subjective belief of the client, but this belief "does not control the issue unless it is reasonably formed based on the attending circumstances, including the attorney's words or actions." *Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992) (emphasis added).

The record does not suggest that even Dr. Sherman believed he had an attorney-client relationship with AAG Milam. Their only contact was a memorandum in which AAG Milam identified himself as an AAG "for the University of Washington" and asked Dr. Sherman to provide his account of the events surrounding the Beasley matter. (Clerk's Papers at 5430.) Not only was there nothing in Dr. Sherman's reply to suggest that he believed an attorney-client relationship had been formed, there was no further contact between them involving this matter.[5]

Even if Dr. Sherman had a subjective belief that AAG Milam was serving as his personal attorney in the Beasley matter, such a belief would not have been reasonable given the circumstances of this case. The body of the memorandum made it clear that AAG Milam was acting as counsel for the University and was simply requesting information from Dr. Sherman in connection with that representation.[6] "An attorney/client relationship is not created . . . merely because an attorney discusses the subject matter of a transaction with a nonclient." *Bohn*, 119 Wn.2d at 364.

---

[5]It is worth mentioning that Dr. Sherman did not object when AAG Milam presented the case against him at the Housestaff Committee hearing, represented the University against Dr. Sherman's attempt to enjoin the termination proceedings, or represented Dr. Hornbein in the ancillary proceeding related to the errant fax.

[6]For example, the memorandum states that "this incident may eventually involve litigation or the filing of a claim *against the University*" and asks that Dr. Sherman prepare a narrative of the events surrounding the incident "to assist me in evaluating this incident and *to properly advise the University* . . . ." (Clerk's Papers at 5430.) (Emphasis added.)

In arguing that an attorney-client relationship was formed, Dr. Sherman relies almost entirely on the fact that the memorandum was headed "CONFIDENTIAL — ATTORNEY CLIENT PRIVILEGE AND WORK PRODUCT." (Clerk's Papers at 5430.) However, the only reasonable interpretation of these words in this context is that correspondence between an attorney for a corporate entity and that entity's employees is subject to the attorney-client privilege of the corporate entity. *See Upjohn Co. v. United States,* 449 U.S. 383, 394-95, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Given that the memorandum clearly articulated that AAG Milam was acting as counsel for the University, even if Dr. Sherman had believed Milam was acting as his personal attorney, which he clearly did not, such a belief would not have been reasonable.

Finally, even if an attorney-client relationship had been formed in connection with the Beasley matter, AAG Milam did not violate RPC 1.9. The trial court based its conclusion that AAG Milam had violated these rules upon its finding of a substantial "overlap" between the Beasley matter and the termination decision. It is clear from the record, however, that these two matters were not "the same or . . . substantially related." RPC 1.9(a). The University terminated Dr. Sherman because it concluded that he had failed to effectively deal with his chemical dependency and failed to follow University policy for disposing of narcotics. The Beasley matter was never mentioned in Dr. Hornbein's January 1989 termination letter nor was evidence concerning the matter presented to the Housestaff Committee, and the committee's report and Dr. Gilliland's final order made no mention of the matter. It is therefore abundantly clear that the two matters were wholly unrelated.

5. Failure To Disclose Negative Urine Test Results

The trial court concluded that Drs. Hornbein and Lecky also violated Dr. Sherman's due process rights by failing to disclose negative urine test results.

Approximately three and one-half hours after the July

14, 1989, operating room incident, Dr. Sherman produced two urine samples, both of which he gave to Dr. Hornbein. What happened next to the urine samples is the subject of some disagreement. Drs. Hornbein and Lecky apparently sent some part of the samples to the Swedish Hospital Laboratory of Pathology, which it forwarded to out-of-state laboratories. According to Appellants, when the laboratory of pathology received the written test results, it sent them directly to Dr. Irons, Dr. Sherman's physician at the WMTP, and gave Drs. Hornbein and Lecky only an oral report of the results. Dr. Sherman does not deny that Dr. Irons received the written test results.[7]

Because Dr. Sherman had access to the negative urine test results through the written report to Dr. Irons, disclosure of the oral confirmation of this by Appellants was unnecessary. The trial court apparently based its ruling on the requirement in a criminal context that a prosecutor reveal material exculpatory evidence to a defendant. *E.g., Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State v. Mak*, 105 Wn.2d 692, 704, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). Neither the trial court nor Dr. Sherman offered authority for the proposition that this duty is applicable in administrative proceedings. Even in the criminal context, there is no due process violation if the party seeking disclosure already has the information. *See State v. Hall*, 22 Wn. App. 862, 866, 593 P.2d 554, *review denied*, 92 Wn.2d 1021 (1979).

Moreover, it is highly questionable that these test results were material in this case. A criminal defendant's due process right to disclosure relates only to evidence that is favorable to the defendant *and* material to guilt or punishment. *State v. Blackwell*, 120 Wn.2d 822, 828, 845 P.2d 1017 (1993). The negative test results here are of doubtful materiality as exculpatory evidence. First, it ap-

---

[7]Although Dr. Sherman alleges that Drs. Hornbein and Lecky arranged for covert testing of the urine with a "private" lab and then withheld the results of this testing, there is no support for this in the record.

pears that urine testing for these narcotic opiates is not reliable, and, thus, a negative test result is, at best, inconclusive as to whether Dr. Sherman used drugs on July 14, 1989. Appellants presented expert evidence to the trial court that sufentanil is extremely difficult to detect in urine. Drs. Hornbein and Lecky testified before the Housestaff Committee that tests for these drugs are unreliable. Dr. Irons, who had access to the test results in Dr. Sherman's WMTP records, testified that Dr. Sherman's urine tests were negative but admitted that a negative test is inconclusive because of the limitations in testing technology.

Second, Dr. Sherman's negative urine test results are not material or exculpatory in this case because Appellants' decision to terminate Dr. Sherman was not based upon whether he in fact used drugs on July 14, 1989, but because of his reaction to the operating room incident. Because whether he actually used narcotics on July 14, 1989, was not the issue, the negative test results did not exculpate him. We therefore conclude that even if there were a *Brady*-type legal duty applicable to administrative proceedings, and Drs. Hornbein and Lecky had the results and Dr. Sherman did not have access to the same information, the failure to disclose would not have violated Dr. Sherman's due process rights because such results were not material to the termination issue.

6. Dr. Hornbein and AAG Milam's Failure To Disclose Dr. Lecky's Chemical Dependency

The trial court concluded that the failure of Dr. Hornbein and AAG Milam to disclose Dr. Lecky's chemical dependency deprived Dr. Sherman of due process. According to Dr. Lecky, he began to suspect that he had a problem several months after the Housestaff Committee heard his testimony at Dr. Sherman's hearing and issued its report. Dr. Hornbein first became aware of Dr. Lecky's chemical dependency shortly before Dr. Gilliland issued the University's final order terminating Dr. Sherman on October 1, 1990.

Dr. Sherman cites RPC 3.4 in support of the trial court's holding. As stated above, however, RPC 3.4 creates no affirmative duties of disclosure. *See supra* part A.1. Even if it did, RPC 3.4 applies only to lawyers and, thus, would not apply to Dr. Hornbein.

The trial court also found that AAG Milam withheld this information, but it acknowledged that the record does not confirm whether AAG Milam possessed this information before Dr. Gilliland issued the University's final order on October 1, 1990. The only evidence in the record is Dr. Hornbein's deposition which states that he does not remember whether he first discussed the matter with AAG Milam shortly before or shortly after the order was issued.

More importantly, even if AAG Milam had the information, it is difficult to imagine that this would have any bearing on the final decision in this case. Dr. Gilliland cited Dr. Lecky's testimony only four times in forty-five pages of findings, and then only for undisputed or cumulative facts. Thus, even if Dr. Lecky's chemical dependency had impeachment value,[8] any error in failing to reveal it was harmless. *See, e.g., State v. Todd*, 78 Wn.2d 362, 372, 474 P.2d 542 (1970). In sum, none of the six instances of procedural irregularities deprived Dr. Sherman of due process.

### B. Whether the Trial Court Ruled on the Merits of the Termination Decision

We must next decide whether the trial court also ruled on the *merits* of the termination decision when it granted summary judgment to Dr. Sherman on his WAPA claim and vacated the termination decision. Resolution of this issue is critical because Dr. Sherman seems to suggest that even if we conclude that the procedural irregularities

---

[8]Despite Dr. Sherman's suggestion that Dr. Lecky's chemical dependency would cause him to try to divert attention from himself by making Dr. Sherman a scapegoat, there is simply no factual or logical basis for this theory.

did not violate due process, he is nevertheless entitled to damages pursuant to his WAPA claim (that the University did not have just cause to terminate Dr. Sherman) because the trial court also ruled on the merits when it invalidated the termination order. (*See* Br. of Resp't at 37-39.)

After carefully reviewing the trial court's rulings and the record, we conclude that the trial court did not so rule. First, the trial court's December 14, 1992, letter ruling explicitly stated that it was invalidating the termination order because of the alleged due process violations "regardless of whether or not there was cause to terminate him under the Housestaff Agreement." (Clerk's Papers at 2027-F.)

Second, we reject Dr. Sherman's contention that the trial court's statement that it was invalidating the termination order because it had been issued in violation of the "state and federal constitutions and was the product of an illegal decision-making process in derogation of RCW 34.05.570(3)(a) and (c)" means that the trial court reached the merits. (Clerk's Papers at 3377.) The trial court's findings and conclusions focus solely on the alleged procedural due process violations. There is simply no discussion about the merits of the Appellants' decision to terminate, nor does any such discussion appear in any of the trial court's subsequent findings and conclusions. Accordingly, the statement can only mean that the trial court concluded that the termination order had been issued in violation of the procedural due process protections afforded under the federal and state constitutions *and* the WAPA. Contrary to Dr. Sherman's assertions, this interpretation is not inconsistent with the trial court's statements in subsequent orders that the discharge had been unlawful and liability already adjudicated.

Because the trial court did not reach the merits of the termination decision, the trial court erred in entering summary judgment for Dr. Sherman on his WAPA claim,

in invalidating the University's termination decision, and in awarding damages to Dr. Sherman.

## C. Disqualification of the Attorney General's Office

The Attorney General contends that the trial court erred in granting Dr. Sherman's motion to disqualify the entire Attorney General's office from representing Appellants in this matter. The trial court based its disqualification order on several of the procedural irregularities discussed *supra* part A.[9] For the same reasons that these incidents do not constitute due process violations, they do not justify the drastic measure of disqualifying the entire Attorney General's office from representing Appellants.

█ As discussed above, the University of Washington health sciences and hospitals section of the Attorney General's office had employed the screening mechanisms approved by this court in *Washington Medical Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 663 P.2d 457 (1983), and by the court of appeals in *Amoss v. University of Washington*, 40 Wn. App. 666, 700 P.2d 350 (1985). This court has previously stated that where a disqualified attorney can be effectively screened and separated from participation, "then the disqualification of the entire prosecuting attorney's office is neither necessary nor wise." *State v. Stenger*, 111 Wn.2d 516, 523, 760 P.2d 357 (1988) (footnote omitted).

We recognize that at the time of its order of disqualifica-

---

[9]Specifically, the trial court based its order on the following conclusions: (1) AAG Milam's June 21, 1989, letter memorandum to Dr. Sherman regarding the Beasley matter and the University's investigation and processing of the Beasley claim created an attorney-client relationship between AAG Milam and Dr. Sherman; (2) AAG Milam violated RPC 1.7 and RPC 1.9 by agreeing to serve as Dr. Hornbein's counsel in the termination action; (3) "[t]his simultaneous representation by Mr. Milam and associate attorneys in his office tainted the termination action and also resulted in inadequate protection of Dr. Sherman's legal rights in *Beasley* . . . ." (Clerk's Papers at 281); and (4) AAG Peterson should have withdrawn as legal counsel to Dr. Gilliland and the University once the ALJ entered his decision that AAGs Milam and Green had an ethical duty to disclose the errant fax.

tion, the trial court believed that AAGs Milam, Green, and Peterson had acted improperly. As discussed *supra*, this has ultimately proved to have been a misperception of the law. Nevertheless, even if there had been legal cause for disqualification, the trial court went too far in disqualifying the entire Attorney General's office. Accordingly, we reverse the trial court's order of disqualification. So long as the Attorney General's office employs the screening mechanism discussed herein, that office may resume representing Appellants in any further proceedings involving this matter.

### D. Breach of Contract

Appellants contend that the trial court erred in granting summary judgment to Dr. Sherman on his breach of contract claim.

By signing a "Residency Position Appointment Agreement" (RPAA) with the University, Dr. Sherman became bound by the University of Washington Housestaff Policy Agreement (HSPA), applicable to all resident physicians in training.[10] A resident who is recommended for termination is entitled to a formal hearing if he or she properly requests one.[11]

Dr. Sherman has not alleged that Appellants have violated any specific procedural provision of the HSPA. Instead, Dr. Sherman argued that he was entitled to summary judgment on this claim because the trial court's

---

[10]The HSPA provided that upon the recommendation of the department chairperson or the Housestaff Committee, the dean of the School of Medicine may terminate a resident for cause after thirty-days' written notice. As to "cause," the agreement provided:

> Conditions for termination will be based on evaluation of the professional performance and fulfillment of the conditions of appointment both to the training program of which the Resident is a member and to the affiliated hospital or clinic to which the Resident is assigned. The total professional behavior of the Resident shall be included in such evaluation.

(Clerk's Papers at 8965.)

[11]The HSPA also mandates that residents "abide by the rules and regulations of the hospitals and clinics" to which they are assigned. (Clerk's Papers at 8952-53.)

entry of summary judgment on his procedural due process claim demonstrated that Appellants had also breached the procedural aspects of the HSPA. In light of our holding, *supra* part A, that Dr. Sherman's procedural due process rights were not violated by any procedural irregularities during the termination proceeding, the trial court erred in granting summary judgment to Dr. Sherman on his breach of contract claim.

### E. Handicap Discrimination/Retaliatory Discharge

Appellants contend that the trial court erred in granting summary judgment to Dr. Sherman on his claims of handicap discrimination under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-97, and the Washington Law Against Discrimination, RCW 49.60.010-.350. The trial court apparently concluded that Dr. Sherman was handicapped but otherwise qualified as a matter of law. In addition, Appellants contend that the trial court erred in granting summary judgment to Dr. Sherman on his claim of retaliatory discharge. We address these contentions in turn.

### 1. Rehabilitation Act of 1973 Claim

The primary purpose behind § 504 of the Federal Rehabilitation Act (the Act) is "to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others."[12] *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S. Ct. 1123, 94 L. Ed. 2d 307, *reh'g denied*, 481 U.S. 1024, 107 S. Ct. 1913, 95 L. Ed. 2d 519 (1987).

To establish a violation of the Act, the plaintiff must make a prima facie showing that: (1) he or she is a "handicapped individual" under the Act; (2) he or she is "otherwise qualified" for the position sought; (3) he or she has been excluded from the position solely by reason of

---

[12]The current version of 29 U.S.C. § 794 uses the term "disability" instead of "handicap." Because the former version was in effect when this action was filed, the superseded terminology will be used. *See Chandler v. City of Dallas*, 2 F.3d 1385, 1389 n.7 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1386 (1994).

his or her handicap; and (4) the position exists as part of a program or activity receiving federal financial assistance. 29 U.S.C. § 794; *see, e.g., Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1386 (1994); *Harris v. Adams*, 873 F.2d 929, 932 (6th Cir. 1989); *Doe v. New York Univ.*, 666 F.2d 761, 774-75 (2d Cir. 1981); *see also Reynolds v. Brock*, 815 F.2d 571, 574 (9th Cir. 1987). We need only focus on the second element in this case.

To analyze a § 504 claim, the Second Circuit has developed an analysis that depends on whether the employer disclaims or acknowledges reliance on the handicap in making the employment decision. *Teahan v. Metro-North Commuter R.R.*, 951 F.2d 511, 514-15 (2d Cir. 1991), *cert. denied*, 113 S. Ct. 54 (1992); *Doe*, 666 F.2d at 776-77. In cases such as this, where the employer acknowledges reliance on the handicap, once the employee establishes a prima facie case of handicap discrimination, the burden shifts to the employer to rebut the inference with evidence that the handicap was relevant to the requirements of the position.[13] *Teahan*, 951 F.2d at 515; *Doe*, 666 F.2d at 776. The pivotal issue is whether, under the circumstances, the handicap provided a reasonable basis for finding the individual not qualified for the position. *Doe*, 666 F.2d at 776. The employee bears the ultimate burden of proving by a preponderance of the evidence that, despite the handicap, he or she is otherwise qualified. *Teahan*, 951 F.2d at 515; *Doe*, 666 F.2d at 776-77.

Appellants assert that a genuine issue of material fact exists as to whether Dr. Sherman was "otherwise qualified" to continue in the residency program. Dr. Sherman

---

[13]Where the employer disclaims reliance, the analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), for suits brought under Title VII of the Civil Rights Act of 1964 is applied. *Teahan*, 951 F.2d at 514-15.

contends that he was otherwise qualified as a matter of law because he could perform his duties with "reasonable accommodation" by continued participation in the WMTP.

The term "otherwise qualified," which is not defined in the Federal Rehabilitation Act of 1973, refers to a person who is qualified *in spite* of the handicap. *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S. Ct. 2361, 60 L. Ed. 2d 980 (1979); *Doe*, 666 F.2d at 775. In the employment context, a qualified handicapped individual is one who, with reasonable accommodation, can perform the essential functions of the position. 45 C.F.R. § 84.3(k)(1); *see also School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n.17, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987); *Alexander v. Choate*, 469 U.S. 287, 301, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985); *Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir. 1991). In such a situation, the employer must provide reasonable accommodation that enables the individual to perform those functions unless it would "impose an undue hardship." 45 C.F.R. § 84.12(a); *see also Arline*, 480 U.S. at 288 n.17.

Thus, whether a person is "otherwise qualified" requires a two-part analysis: (1) whether the person can perform the essential functions of the job despite the handicap and, if not, (2) whether the handicap can be reasonably accommodated. *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994); *Gilbert*, 949 F.2d at 641; *Arline*, 480 U.S. at 288.

Dr. Sherman does not contend that he could perform the essential functions of his position despite his chemical dependency. Thus, we must decide if the trial court correctly determined that no genuine issue of material fact exists as to whether Dr. Sherman would be "otherwise qualified" to remain in the anesthesiology residency program by means of "reasonable accommodation," specifically by continuing to participate in the WMTP. In

contending that Dr. Sherman's continued participation in the WMTP would no longer be a reasonable accommodation, Appellants essentially argue that Dr. Sherman's past participation in the WMTP should not foreclose them from reexamining whether this course of treatment may still be effective.

■ In the context of permitting a physician to practice medicine, "[r]easonable accommodation . . . necessarily is accommodation that eliminates significant risk to patients." *Ramachandar v. Sobol*, 838 F. Supp. 100, 109 (S.D.N.Y. 1993) ("The Act does not require professional licensing authorities, against their best judgment, to play Russian roulette with public health."). Whether the risks posed by the handicap can be borne with reasonable accommodation is an issue of fact. *Id.* at 108; *see also Pandazides*, 13 F.3d at 833 (holding that "otherwise qualified" and "reasonable accommodation" are questions of fact); *McGregor v. Louisiana State Univ.*, 3 F.3d 850, 855 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1103 (1994); *Brennan v. Stewart*, 834 F.2d 1248, 1260 (5th Cir. 1988). The judgment of medical professionals as to whether the risks posed by the plaintiff can be reasonably accommodated is entitled to some deference. *Ramachandar*, 838 F. Supp. at 108; *cf. Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985).

■ Under the facts of this case, one simply cannot conclude *as a matter of law* that Dr. Sherman's handicap could be reasonably accommodated via continued participation in the WMTP, rendering him otherwise qualified to continue in the residency program. In other words, it cannot be said that reasonable minds could reach only this conclusion in view of the following facts: (1) Dr. Sherman's history of chemical dependency, which includes an incident of relapse; (2) the well-recognized risk of future

relapse;[14] and (3) Dr. Sherman's reaction to the July 14, 1989, incident that led his supervisors to conclude, based on their expertise in the area, that, despite participation in the WMTP, he was not dealing effectively with his condition. A trier of fact could reasonably determine that under these circumstances participation in the WMTP no longer constituted an "accommodation" because it would not render him "otherwise qualified."

To determine this issue as a matter of law is particularly inappropriate given the significant public safety concerns implicated in a case such as this where an institution is faced with the prospect that one of its anesthesiology residents will use anesthetic narcotics, uniquely available in the specialty, in the course of treating patients. It is recognized that recovery from chemical dependency is an ongoing process and that one is never "recovered" but always "recovering." While this does not mean that a person in recovery should be forever subject to scrutiny, supervision and reassessment at least for some period of time is appropriate. It therefore cannot be said as a matter of law that Dr. Sherman's *past* participation in the WMTP, even if deemed successful, necessarily ensures that this will continue to accommodate his chemical dependency in the future.

Viewing the facts in the light most favorable to Appellants and giving deference to their judgment as medical professionals that the risks posed by Dr. Sherman to patients and himself could not be reasonably accommodated, we conclude that the issue of whether Dr. Sherman is "otherwise qualified" is a question of fact for a jury, not one for the court to decide as a matter of law. Accordingly, we reverse the trial court's order of summary judgment on Dr. Sherman's federal handicap discrimination claim.

## 2. Washington Law Against Discrimination

---

[14]Risk of relapse is a factor to be considered when determining whether a person is "otherwise qualified." *See Teahan*, 951 F.2d at 520; *Doe*, 666 F.2d at 778.

Appellants also contend that the trial court erred in granting summary judgment to Dr. Sherman on his handicap discrimination claim brought under the Washington Law Against Discrimination (WLAD), RCW 49.60.180. Because neither side has engaged in an independent analysis under WLAD, each assuming that analysis to be the same as under federal law, and because it has no bearing on the outcome, we will not engage in an extensive analysis here.

This court has consistently held that the first prong of a handicap discrimination claim brought under RCW 49.60.180, "presence" of a handicap, is a factual question for the jury because it is dependent upon expert medical testimony, medical documentation, and state of mind. *Doe v. Boeing Co.*, 121 Wn.2d 8, 15, 846 P.2d 531 (1993); *Phillips v. City of Seattle*, 111 Wn.2d 903, 909-10, 766 P.2d 1099 (1989). Likewise, this court has consistently held that the second prong of this claim, whether the employer discriminated against the employee because of that condition, is a factual question for the jury because it is dependent upon the documentation of the employer, testimony regarding the termination, and other relevant facts. *Doe*, 121 Wn.2d at 15; *Phillips*, 111 Wn.2d at 909 ("The jury should decide this question after deliberation, rather than courts deciding based upon the same facts as a matter of law.").

Even assuming that reasonable minds could reach only the conclusion that Dr. Sherman's chemical dependency is a handicapping condition under WLAD, the second prong of the analysis requires resolution of whether this condition can be reasonably accommodated. *Doe*, 121 Wn.2d at 17. For the same reasons that we reversed the entry of summary judgment on Dr. Sherman's Rehabilitation Act claim, *supra* part E.1, concluding that a genuine issue of material fact existed as to whether Dr. Sherman's handicap can be reasonably accommodated, we reverse the order of summary judgment on Dr. Sherman's WLAD claim.

3. Retaliatory Discharge

Appellants contend that the trial court also erred in

granting summary judgment to Dr. Sherman on his retaliatory discharge claim under WLAD, RCW 49.60.210.

Dr. Sherman concedes that the trial court's entry of summary judgment on his retaliatory discharge claim was based on its determination that Dr. Sherman's procedural due process rights had been violated. In light of our holding, *supra* part A., that the procedural irregularities that occurred during the termination proceedings did not violate due process as a matter of law, we must, as Appellants correctly contend, reverse the trial court's order granting summary judgment to Dr. Sherman on his retaliatory discharge claim.

Because this matter will be remanded for trial, we address Appellants' contention that the trial court abused its discretion in refusing to allow them to depose Dr. Sherman's health care providers about his chemical dependency. The trial court ruled that Dr. Sherman had not waived the physician-patient privilege. *See* RCW 5.60.060(4). This was error.

RCW 5.60.060(4)(b) provides in relevant part: "Ninety days after filing an action for personal injuries or wrongful death, the claimant shall be deemed to waive the physician-patient privilege." By filing an action for damages in which he included claims of handicap discrimination and defamation, Dr. Sherman has waived the physician-patient privilege.

## F. Recusal

Appellants contend that the trial judge erred in denying their motion for recusal and vacatur, which was based on their allegation that the judge had initiated an improper ex parte communication.

On June 25, 1992, the judge directed his judicial extern to contact the WMTP for general information about the process used to monitor recovering physicians. At the time, the judge was considering Dr. Sherman's motion for reinstatement pending judicial review and was in the process of reviewing Dr. Sherman's treatment records in

camera to determine whether to release them to Appellants.

The extern first spoke with Dr. Arthur Zebelman, who apparently referred him to Dr. Daniel Wolf, another WMTP physician. Dr. Wolf then discussed with the extern the general procedures used to monitor an anesthesiologist with a history of substance abuse.

Just prior to the August 1993 damages hearing, Appellants' counsel discovered a notation in the WMTP's charts indicating that the extern had contacted Dr. Wolf with questions "regarding urine/drug monitoring for physicians in our program, *in particular as it pertains to Scott Sherman*." (Clerk's Papers at 9469.) (Emphasis added.) Four days later, Appellants moved for recusal and vacation of all rulings made since the ex parte contact.

The judge explained that to better understand the materials presented for in camera review, he had needed general information as to how the WMTP monitors chemically dependent physicians. Once he received the information, he stated that he was able to determine that the materials should be turned over to Appellants. Although the judge did not believe that he had violated the Code of Judicial Conduct (CJC) (1994), he reserved ruling to permit the parties to provide briefing and depose Dr. Wolf.

Dr. Wolf testified by declaration that he had not provided the extern with any information specific to Dr. Sherman's treatment. Following a hearing on the motion, the judge granted the motion for recusal but denied the motion to vacate his prior rulings. Then, pursuant to a motion for reconsideration, the judge reversed his prior decision, ruling that even recusal was unnecessary.

Canon 3 of the CJC, which requires judges to perform the duties of their offices impartially and diligently, provides in relevant part:

> Judges should accord to every person who is legally interested in a proceeding, or that person's lawyer, full right to be heard according to law, and, except as authorized by law, neither *initiate* nor consider *ex parte* or other com-

munications concerning a pending or impending proceeding. . . .

CJC Canon 3(A)(4) (1994) (emphasis added). As the comment to Canon 3 explains, this prohibition against ex parte communications includes contacting neutral third parties about a pending case:

> The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and *other persons who are not participants in the proceeding*, except to the limited extent permitted. . . .

CJC Canon 3(A)(4) cmt. (1994) (emphasis added).

We conclude that the judge violated the unambiguous dictates of this rule when he directed his extern to contact the physicians charged with monitoring Dr. Sherman's chemical dependency for information about the monitoring process. *See State v. Romano*, 34 Wn. App. 567, 569, 662 P.2d 406 (1983); *State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993).

 The remaining inquiry is whether this ex parte communication requires recusal.[15] Dr. Sherman argues that recusal was unwarranted because Appellants suffered no prejudice on account of the ex parte communication. However, in deciding recusal matters, actual prejudice is not the standard. The CJC recognizes that where a trial judge's decisions are tainted by even a mere suspicion of partiality, the effect on the public's confidence in our judicial system can be debilitating. The CJC provides in relevant part: "Judges should disqualify themselves in a proceeding in which their impartiality might reasonably

---

[15]Dr. Sherman contends that Appellants have waived their right to move for recusal because they had the files for several months before they raised the issue. A party must use due diligence in discovering possible grounds for recusal and then act upon this information by promptly seeking recusal. *See State v. Carlson*, 66 Wn. App. 909, 916, 833 P.2d 463 (1992), *review denied*, 120 Wn.2d 1022 (1993). The trial court determined that the motion for recusal was timely because it believed Appellants had simply overlooked the entry for a period of months. We see no reason to second-guess the trial court's credibility determination.

be questioned . . . ." CJC Canon 3(C)(1) (1995). The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that "a reasonable person knows and understands all the relevant facts." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (emphasis omitted), *cert. denied*, 490 U.S. 1102 (1989); *see also United States v. Murphy*, 768 F.2d 1518, 1538 (7th Cir. 1985), *cert. denied*, 475 U.S. 1012 (1986).

Under the circumstances, we consider the safest course to be remand of the matter to another judge. By contacting the WMTP for information about the monitoring process for chemically dependent physicians, the trial judge may have inadvertently obtained information critical to a central issue on remand, namely, whether Dr. Sherman's continued participation in the WMTP is a reasonable accommodation of his chemical dependency. Given that fact, a reasonable person might question his impartiality.

Finally, Appellants have raised numerous issues pertaining to the trial court's damages awards.[16] However, because we reverse the trial court's summary judgment order on Dr. Sherman's WAPA claim and its summary judgment order on Dr. Sherman's breach of contract, federal and state handicap discrimination, and retaliatory discharge claims, we need not reach these issues.

In sum, we reverse the trial court's order granting summary judgment to Dr. Sherman on his WAPA claim based

---

[16]Those issues include whether: (1) the trial court erred in invalidating the termination order and awarding damages under the WAPA rather than remanding for a new hearing when the trial court did not rule on the merits of the University's decision to terminate; (2) the trial court erred in entering judgment against Appellants on Dr. Sherman's § 1983 claim because of lack of notice and an opportunity to defend; (3) Dr. Sherman has stated a claim for relief under § 1983; (4) compensatory damages were awardable under § 1983; (4) the University is subject to liability under § 1983; (5) the trial court abused its discretion in denying Appellants' request for a jury trial to determine the amount of compensatory damages and the propriety of a punitive damages award; (6) Appellants were immune from liability; (7) punitive damages were properly awarded under § 1983; (8) the trial court lacked authority to award punitive damages under RCW 49.60; and (9) the attorneys' fees award should be reduced to reflect those claims upon which Sherman did not prevail.

on procedural irregularities and disqualifying the Attorney General's office from representing Appellants in this action. We also reverse the orders of summary judgment in favor of Dr. Sherman on his claims of breach of contract, federal and state handicap discrimination, and retaliatory discharge, and remand these matters for trial.

DURHAM, C.J., and DOLLIVER, GUY, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.

After modification, further reconsideration denied January 31, 1996.