IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84609-4-I |
| Respondent, | |
| v. | DIVISION ONE |
| RIGOBERTO GALVAN, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Rigoberto Galvan broke into his ex-girlfriend Stephanie Cresswell-Brenner's apartment and waited for her to return home. When she did not answer his texts and calls, Galvan crawled through a bathroom window and onto the balcony of the unit next door where he knew Cresswell-Brenner was visiting with a neighbor. He entered through the balcony doors, announced that Cresswell-Brenner was going to die, and proceeded to shoot her 15 times at close range. Galvan was later charged with and convicted of aggravated murder in the first degree, with a domestic violence and deadly weapon enhancement, and burglary in the first degree with a deadly weapon enhancement.

On appeal, Galvan contends that his right to a unanimous jury verdict was violated because the State submitted evidence that two robberies occurred, but did not require the jury to agree on which act supports its conviction. He also asserts that he is a youthful offender and that the trial court violated our state constitution's prohibition against cruel punishment by imposing a sentence of life

without the possibility of parole. To this point, he maintains that the trial court violated the appearance of fairness doctrine by remarking that his sentence was appropriate. Finally, Galvan requests that this case be remanded for the trial court to waive restitution interest and strike several legal financial obligations from the judgment and sentence.

We find no violation of Galvan's right to a unanimous jury, nor to the prohibition of cruel punishment, nor to the appearance of fairness doctrine. However, we agree that remand is appropriate for the trial court to strike certain fees from the judgment and sentence and to consider waiving restitution interest.

FACTS

While attending Western Washington University, Rigoberto Galvan and Stephanie Cresswell-Brenner dated and lived together from July 2018 until May 2019. However, in early 2019, their relationship began to deteriorate. Galvan had cheated on Cresswell-Brenner several times and the two were fighting more frequently. Galvan also closely monitored Cresswell-Brenner's social media presence and forbade her from following male friends during the relationship. Cresswell-Brenner's roommates testified that Galvan was "mean," "condescending," and "controlling." One roommate, Kaylie Gerald, recalled a verbal fight that ended with a "loud thud." Gerald noted that Cresswell-Brenner was "doing everything" for Galvan, including his laundry and cooking, but that Galvan "wasn't talking to her" and "he wasn't being kind to her."

In spring of 2019, Cresswell-Brenner ended the relationship. Galvan moved out shortly afterwards, in May 2019. After the breakup, Galvan continued

to show up at Cresswell-Brenner's house unannounced and uninvited.[1] Despite these unwelcome appearances, Cresswell-Brenner's roommates and friends noticed that she was happier and more social.

On August 11, 2019, Galvan asked his friend, Taylor Cameron, for a ride to Bellingham so he could break things off with Cresswell-Brenner. When they arrived at Cresswell-Brenner's house, Galvan told Cameron to wait in the car. When he emerged 45 minutes later, Galvan's demeanor was different. While Galvan had been emotionally distraught and crying before, he now appeared anxious and closed off. Galvan later relayed that he had asked Cresswell-Brenner for a second chance and that she said no. Galvan also asked Cresswell-Brenner to not date anyone else for a while.

The next day, Cameron reached out to Galvan and asked him to meet for lunch. Over lunch, Galvan repeatedly asked Cameron, "Would you be mad at me?" but did not explain further.

Around the same time, Galvan noticed that Cresswell-Brenner had unfollowed him on social media. He also noticed that she had started to follow her next door neighbor, Aiden Kuhne, on social media and became jealous.

On August 13, 2019, Galvan had dinner with his parents and told them that he and Stephanie were no longer dating. After dinner, he worked his shift as a volunteer firefighter. His coworker testified that he did not notice anything

---

[1] Kaylie Gerald testified that Galvan would "walk in the house, not knock, ever, very entitled in that way, just walk in."

3

unusual about Galvan's demeanor and that Galvan had no difficulties performing his duties.

Later that evening, however, Galvan drove to Cresswell-Brenner's house, armed with a gun tucked into his waistband. He parked his car in a nearby alleyway to avoid being seen. When he arrived, Galvan stood outside, listening to Cresswell-Brenner and Kuhne talking in Kuhne's unit next door. Galvan then proceeded to enter Cresswell-Brenner's unit unannounced, using a hidden spare key that Cresswell-Brenner and her roommates kept outside to unlock the front door. Galvan went upstairs to Cresswell-Brenner's room and continued to listen to Cresswell-Brenner and Kuhne talking next door. As he waited and listened, Galvan repeatedly called and texted Cresswell-Brenner in an attempt to get her to come back to her unit. After looking through the bathroom window and seeing Cresswell-Brenner and Kuhne sitting on the couch, Galvan texted Cresswell-Brenner that he was in her room. Cresswell-Brenner texted back that he needed to leave or she would call the police.

Shortly thereafter, Galvan crawled through Cresswell-Brenner's bathroom window and onto the balcony of Kuhne's adjoining apartment. He entered Kuhne's apartment, drew his gun, and told Kuhne: "Aiden, run away. Call 911, she is going to die." Kuhne fled and immediately called the police. As he ran, he heard between 12 to 15 gunshots, punctuated by Cresswell-Brenner screaming. Kuhne later recalled that Galvan was "scarily calm" while Cresswell-Brenner screamed and cried.

4

Galvan fired 15 rounds from his gun, emptying the magazine. Ten bullets hit Cresswell-Brenner, killing her. After he shot Cresswell-Brenner, Galvan left Kuhne's unit and crawled back through Cresswell-Brenner's bathroom window and into her room. He deposited the empty gun on her bed and left. Once outside, Galvan called 911. Galvan told the 911 operator: "Hey, I'm at 939 20th Street, you need to send out here as many cops as you can. I just killed my girlfriend." When the operator told Galvan that help was on the way, Galvan replied: "She's dead, so there is no help. You don't need to send medics, trust me." Galvan then asked the operator, "Have you ever been jealous?" Galvan's 911 call was placed approximately one minute after Kuhne's.

Kuhne's roommate, Ian Stewart, was downstairs at the time. He heard arguing upstairs, followed by a male voice saying "run and I shoot" and then a female screaming. Cassidy Schlicke-Perez, one of Cresswell-Brenner's roommates, was home asleep when she heard gunshots. Shortly after the gunshots, she heard someone enter the unit and then heard a male voice start talking.

Police arrived on the scene to find Galvan walking in the middle of the street with his hands in the air. Galvan told the responding officers, "I'm the one you're looking for. I shot my girlfriend."

When officers reached Kuhne's unit, they immediately began administering aid to Cresswell-Brenner. Paramedics arrived shortly after and pronounced Cresswell-Brenner dead on the scene. Officers later described Galvan's demeanor as a "completely blank affect" and "unemotional." Despite

5

being trained to provide medical aid, Galvan later relayed that he did not make any attempt to provide Cresswell-Brenner aid.

The State charged Galvan with aggravated murder in the first degree, with a domestic violence and deadly weapon enhancement, and burglary in the first degree with a deadly weapon enhancement. The jury convicted Galvan as charged. Galvan appeals.

ANALYSIS

Jury Unanimity

Galvan contends that the lack of a unanimity instruction as to the burglary charge combined with the State's failure to make an election as to which unlawful entry it was relying on for the charge violated his constitutional right to a unanimous jury verdict. We disagree. Because Galvan's actions constituted a continuing course of conduct, no unanimity instruction was necessary.

Before reaching the issue of jury unanimity, we must first address two threshold issues raised by the State. First, whether Galvan may raise jury unanimity for the first time on appeal, and second, even if he can, whether the invited error doctrine precludes him from doing so. We conclude that neither precludes Galvan from arguing jury unanimity on appeal.

1. Raised for the First Time on Appeal

The State contends that Galvan may not argue jury unanimity on appeal because he did not object to the absence of a unanimity instruction before the trial court. Because jury unanimity is a constitutional issue, we disagree.

6

Under RAP 2.5(a), an "appellate court may refuse to review any claim of error which was not raised in the trial court." However, "a party may raise . . . manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). Issues concerning jury unanimity are constitutional in nature and may be raised for the first time on appeal under the manifest constitutional error standard. State v. Aguilar, 27 Wn. App. 2d 905, 918, 534 P.3d 360 (2023).

Here, the lack of a unanimity instruction is an issue of manifest constitutional error that Galvan may raise for the first time on appeal.

2. Invited Error Doctrine

The State also argues that, under the invited error doctrine, Galvan may not address jury unanimity on appeal because he invited the jury to find him guilty of burglary in the first degree. We are unconvinced.

The invited error doctrine precludes a party from seeking appellate review of an error they helped create, even when the alleged error involves constitutional rights. State v. Mercado, 181 Wn. App. 624, 629-30, 326 P.3d 154 (2014). To determine whether the invited error doctrine applies, we consider whether the party affirmatively assented to the error, materially contributed to it, or benefitted from it. Mercado, 181 Wn. App. at 630. "To be invited, the error must be the result of an affirmative, knowing, and voluntary act." Mercado, 181 Wn. App. at 630. An appellant "must materially contribute to the error challenged on appeal by engaging in some type of affirmative action through which he knowingly and voluntarily sets up the error." Mercado, 181 Wn. App. at 630. A lack of objection to jury instructions does not constitute invited error. State v.

7

Richardson, 12 Wn. App. 2d 657, 666, 459 P.3d 330 (2020); cf., State v. Studd, 137 Wn.2d 533, 546, 973 P.2d 1049 (1999) (invited error precludes defendant from challenging their own erroneous jury instruction on appeal).

Here, neither party requested a unanimity instruction or objected to the instructions given. Both the State and Galvan specifically declined to add further detail to the instructions on the burglary charge, despite the court's concern regarding the definition of burglary and despite the parties' disagreement about whether Galvan committed two burglaries or whether his actions constituted a continuing course of criminal conduct.

Still, the State contends that certain statements by Galvan's counsel during closing constituted invited error. During closing, Galvan's counsel told the jury that Galvan was not contesting the burglary charge:

> And then you have Count II, which is Burglary in the First Degree. It's not in question folks, we're not contesting Count II either.

These remarks, without more, do not constitute invited error. Galvan did not affirmatively propose an erroneous jury instruction or relieve the jury of its requirement to reach unanimity. In fact, during closing, Galvan told the jury:

> So you've heard and you know that you have to be unanimous in your verdict. You can't have a verdict with half of you saying not guilty on Count I and half saying guilty on Count I. At least you can't have a verdict on that count, so you all have to be unanimous.

Galvan's request that the jury find him guilty of burglary is more appropriately characterized as a tactical decision on counsel's part given the evidence presented at trial. It was not invited error.

8

### 3.  Specific Act and Continuing Course of Criminal Conduct

Galvan contends that because the State identified multiple acts, any one of which could serve as the basis for the burglary charge, the State needed to elect a single act.  Alternatively, Galvan contends that the court needed to give a Petrich[2] instruction.  The State asserts that the prosecutor did make such an election during closing.  We agree that the State failed to make an election.  However, such an election was unnecessary because Galvan's actions constituted a continuing course of conduct.

Criminal defendants have a right to a unanimous jury verdict.  WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994).  When the State presents evidence of multiple acts that could serve as the basis for the crime charged, it must either tell the jury which act to rely on in its deliberations, or the court must instruct the jury that it has to unanimously agree on which act supports the conviction.  State v. Kitchen, 110 Wn.2d 403, 409-11, 756 P.2d 105 (1988).  The former is known as an "election," and the latter is known as giving a "Petrich" instruction, after the case in which the instruction originated.  Kitchen, 110 Wn.2d at 411 ("election"); State v. Carson, 184 Wn.2d 207, 228-29, 357 P.3d 1064 (2015) ("Petrich instruction").  An election must " 'clearly identif[y]' " which act the charge in question is based upon.  Carson, 184 Wn.2d at 227 (quoting State v. Thompson, 169 Wn. App. 436, 474-75, 290 P.3d 996 (2012)).

---

[2]  State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984).

Whether a unanimity instruction is required is a question of law that we review de novo. Aguilar, 27 Wn. App. 2d at 924. Failure to either make an election or give a Petrich instruction may be constitutional error because of "the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wn.2d at 411.

The State contends that it elected a single unlawful entry to serve as the basis for the burglary charge during closing. We disagree.

During closing argument, the State told the jury:

And by the way, he committed two burglaries; he entered unlawfully with a firearm into Stephanie's home, then he entered Aiden's home unlawfully with a firearm. Those are both burglary one. And the burglary one was absolutely committed, and by the way this is Verdict Form B, it was absolutely committed before the murder because he entered unlawfully with the intent to commit a crime therein and he was armed with a firearm. That happened before because we know he had a firearm and we know he entered unlawfully.

He announced what he was going to do before he committed the fatal act. That's, his announcement are his thoughts. That is an expression of his thoughts. That is the premeditation, that is the premeditated design to kill.

It is unclear from these statements whether the State is relying on the first or second unlawful entry as the basis of the burglary charge. What is clear, however, is that there were two unlawful entries, either one of which could have served as the basis for the charge of burglary in the first degree. The record demonstrates that the State failed to make an election.

10

However, despite the State's failure to elect a single act, no <u>Petrich</u> instruction or election was necessary because Galvan's actions constituted a continuing course of conduct.

An election or <u>Petrich</u> instruction is not required where the evidence indicates a " 'continuing course of conduct.' " <u>State v. Handran</u>, 113 Wn.2d 11, 17, 775 P.2d 452 (1989) (quoting <u>Petrich</u>, 101 Wn.2d at 571). A continuing course of conduct is "an ongoing enterprise with a single objective." <u>State v. Love</u>, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). "Common sense is the guiding light of this analysis." <u>Aguilar</u>, 27 Wn. App. 2d at 925. To determine whether a defendant's actions constituted a continuing course of conduct, we "evaluate the facts in a commonsense manner considering (1) the time separating the criminal acts and (2) whether the criminal acts involved the same parties, location, and ultimate purpose." <u>State v. Brown</u>, 159 Wn. App. 1, 14, 248 P.3d 518 (2010). "[E]vidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred," while "evidence that a defendant engage[d] in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct." <u>State v. Fiallo-Lopez</u>, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).

The evidence here supports that Galvan's actions are properly characterized as a continuing course of criminal conduct. The day before the murder, Galvan hinted to a friend that he was planning something nefarious. Galvan asked the friend multiple times, "Would you be mad at me?" but did not

11

finish his thought. Around the same time, Galvan became upset when he learned that Cresswell-Brenner had unfollowed him on social media and that she had started following her neighbor, Aiden Kuhne.

The night of the murder, Galvan confessed to his parents that his relationship with Stephanie was over. After working his shift as a volunteer firefighter, Galvan loaded his gun with hollow point bullets and drove to Cresswell-Brenner's house. Rather than holstering his gun, as he typically did, Galvan hid the gun in the waistband of his pants. And instead of parking where he typically would, Galvan parked in an alleyway so that his car would not be seen. Galvan then entered Cresswell-Brenner's house and waited in her room. While in Cresswell-Brenner's room, Galvan texted and called her repeatedly. Galvan later explained that he was "trying to get [Cresswell-Brenner] to come over so [they] don't have to put on this whole show in front of somebody else." Eventually, Galvan texted Cresswell-Brenner that he was in her room. Cresswell-Brenner told him to leave. Shortly thereafter, Galvan crawled through the bathroom window and onto the balcony of the unit next door, where Cresswell-Brenner and Kuhne were inside talking. When he entered the unit, he instructed Kuhne to run away and informed him that Cresswell-Brenner was "going to die."

These facts are consistent with a continuing course of conduct. Galvan engaged in a series of actions intended to secure the singular objective of killing Cresswell-Brenner. Although the crimes charged involved two distinct locations—Cresswell-Brenner and Kuhne's units—the series of events indicates

that Galvan's actions were committed with an ultimate purpose in mind. Even while he was waiting in Cresswell-Brenner's unit, Galvan continued to contact her to try to draw her out of the neighboring unit.

Galvan contends that this is a multiple acts case rather than a continuous course of conduct case. In support of this assertion, he relies on State v. Irby, 187 Wn. App. 183, 347 P.3d 1103 (2015) and Aguilar, 27 Wn. App. 2d 905. Neither case is persuasive here.

In Irby, the defendant appealed the State's failure to make an election as to which of the defendant's two acts of allegedly unlawful entry constituted the charged burglary. 187 Wn. App. at 197-98. This court concluded that this failure was reversible error because a juror could have entertained a reasonable doubt that the defendant burglarized the first location. Irby, 187 Wn. App. at 199. But neither party in Irby argued that the defendant's actions were a continuing course of conduct and this issue was not discussed on appeal. Therefore, Irby is unhelpful here.

The next case, Aguilar, is also distinguishable. In Aguilar, this court concluded that the facts were more consistent with multiple acts rather than a continuing course of conduct. 27 Wn. App. 2d at 927. The timeline of events was unclear and the testimony indicated that there were intervening events between the charged criminal acts. Aguilar, 27 Wn. App. 2d at 927. Significantly, the defendant's state of mind and behavior did not demonstrate the existence of an ongoing enterprise with a single objective—Aguilar "acted erratically under the influence of intoxicants, his focus shifting rapidly from one

thing to another." Aguilar, 27 Wn. App. 2d at 927. Unlike the defendant in Aguilar, Galvan was not under the influence and did not act erratically when he committed the crimes in question. Rather, the timeline of events and Galvan's actions before and afterwards demonstrate that he thoughtfully planned the burglary and murder.

Galvan's assertion that he engaged in acts with different objectives is similarly unconvincing. In support of this assertion, Galvan claims that there was evidence that he entered Cresswell-Brenner's unit with the objective of confronting her and talking with her about the state of their relationship. He also maintains that he was experiencing a great deal of psychological turmoil and felt caught in "a loop of indecision." But these claims are belied by evidence showing that Galvan carefully planned his actions that evening: he took care to park his car where it would not be seen, to hide his gun in his waistband, to load his gun with hollow point bullets, to leave the empty gun on Cresswell-Brenner's bed, and to call the police and tell them where he would be, walking with his arms raised and not resisting arrest. We conclude that Galvan's actions here constituted a continuing course of conduct.

## Sentencing

Galvan contends that the trial court violated our state constitution's prohibition against cruel punishment by imposing a sentence of life without the possibility of parole. He maintains that the court failed to properly consider his youthfulness at sentencing and that the court erred by requiring him to prove youthfulness as a mitigating factor by a preponderance of the evidence.

14

We disagree. Galvan was an adult when he committed the crimes in question and the court did not possess the discretion to consider youthfulness as a mitigating factor. Therefore, the court erred by considering youthfulness and by requiring Galvan to prove youthfulness as a mitigating factor by a preponderance of the evidence.

We review questions of constitutional law de novo. State v. Ramos, 187 Wn.2d 420, 433, 387 P.3d 650 (2017). And we review a sentencing court's decision for an abuse of discretion, reversing "only if we find 'a clear abuse of discretion or misapplication of the law.' " State v. Delbosque, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (internal quotation marks omitted) (quoting State v. Blair, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)). A trial court abuses its discretion if its decision "is manifestly unreasonable or based upon untenable grounds." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). However, sentencing errors generally do not require remand if the reviewing court is satisfied that the trial court would have imposed the same sentence based on proper factors. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003).

In sentencing juvenile and youthful offenders, trial courts have discretion to depart from the standard range under the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, when a defendant's youthfulness impairs their capacity to appreciate the wrongfulness of their conduct, or to conform their conduct to the requirements of the law. State v. O'Dell, 183 Wn.2d 680, 696, 698-99, 358 P.3d 359 (2015). The sentencing court must exercise its discretion to decide when a defendant's youthfulness has such an effect. O'Dell, 183 Wn.2d at 699. The

15

SRA places the burden of proving that substantial and compelling reasons justify the imposition of an exceptional sentence on the defendant. RCW 9.94A.535. "However, once a sentencing court has considered youth and determined that it is a mitigating factor, the exceptional sentencing requirements imposed by the SRA are simply no longer applicable." State v. Rogers, 17 Wn. App. 2d 466, 476, 87 P.3d 177 (2021).

However, the SRA is not the only means by which a sentencing court may exercise discretion to properly account for a defendant's youthfulness. The prohibition on cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution provides additional protections for juveniles and youthful offenders at sentencing. In re Pers. Restraint of Monschke, 197 Wn.2d 305, 311 n.6, 482 P.3d 276 (2021) (plurality opinion). For example, it is constitutionally impermissible to impose mandatory life sentences without the possibility of parole on juveniles under the age of 18. Miller v. Alabama, 567 U.S. 460, 472-73, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

Likewise, for defendants younger than 18, "[t]rial courts must consider mitigating qualities of youth at sentencing," such as " 'immaturity, impetuosity, and failure to appreciate risks and consequences[,]' . . . along with any other factors suggesting that the child might be successfully rehabilitated." State v. Houston-Sconiers, 188 Wn.2d 1, 21, 23, 391 P.3d 409 (2017) (quoting Miller, 567 U.S. at 477). Trial courts must also have "full discretion to depart from the sentencing guidelines and any otherwise mandatory sentence enhancements."

Houston-Sconiers, 188 Wn.2d at 34.  More recently, our Supreme Court extended the discretion of sentencing courts to permit consideration of the mitigating qualities of youth for defendants who were 19- and 20-years-old at the time of their offenses.  Monschke, 197 Wn.2d at 311.

Under either the SRA or the federal and state constitutions, a trial court engages in a two-part test during sentencing.  First, the court must determine whether the defendant is a juvenile or youthful offender.  See Houston-Sconiers, 188 Wn.2d at 21-23; Monschke, 197 Wn.2d at 311.  If the defendant is not a juvenile or a youthful offender, the court is bound by the discretion provided for in the SRA or in the applicable sentencing statute.  If the defendant is a juvenile or a youthful offender, the court must then determine whether the defendant's youthfulness impaired their capacity to appreciate the wrongfulness of their conduct, or to conform their conduct to the requirements of the law.  O'Dell, 183 Wn.2d at 696, 698-99.

Because Galvan was 22 years old at the time he committed his crimes, he is not a youthful offender and the trial court could not consider youthfulness as a mitigating factor at sentencing.

In Monschke, our Supreme Court held that sentencing courts must exercise the same discretion in sentencing 18-, 19-, and 20-year-olds as when sentencing juvenile offenders.  197 Wn.2d at 329.[3]  But in the years following Monschke, Washington courts have repeatedly declined to extend its holding to

---

[3] Although the lead opinion in Monschke notes that youthful offenders can be between 17- and 25-years-old, the majority's holding only extends to 18-, 19-, and 20-year-old defendants.  197 Wn.2d at 329.

other factual scenarios. See, e.g., State v. Meza, 22 Wn. App. 2d 514, 545, 512 P.3d 608 (holding that Monschke did not categorically extend leniency based on mitigating factors of youth to 21-year-old defendant), review denied, 200 Wn.2d 1021, 520 P.3d 978 (2022); State v. Zwede, 21 Wn. App. 2d 843, 862-63, 508 P.3d 1042 (declining to address constitutionality of indeterminate sentence for youthful offender), review denied, 200 Wn.2d 1006 (2022); State v. Kruger, 28 Wn. App. 2d 549, 556, 540 P.3d 126 (2023) (declining to reach whether prohibition on de facto life sentences applies to 20-year-old defendant), review denied, No. 102732-0 (Wash. May 8, 2024).

Here, Galvan was charged with aggravated murder in the first degree under RCW 10.95.030(1). Sentencing for aggravated murder in the first degree is not provided for within the SRA and neither the provisions of the SRA nor the provisions of any other statute authorize a sentencing court to exercise discretion when sentencing a defendant convicted of aggravated murder in the first degree. See RCW 10.95.030 (". . . any person convicted of the crime of aggravated first degree murder *shall* be sentenced to life imprisonment without possibility of release or parole.") (emphasis added); ch. 9.94A RCW. Because Galvan is not a youthful offender under Monschke, the trial court could not exercise discretion during sentencing. Therefore, the court was required, under RCW 10.95.030, to sentence Galvan to life without the possibility of parole.

We decline to extend the holding in Monschke to Galvan, who was 22 years old when he committed the offenses at issue. We also conclude that the court erred by considering youthfulness as a mitigating factor because the court

18

did not possess the discretion to impose a sentence other than life without the possibility of parole.

### Appearance of Fairness

Galvan next asserts that the trial court violated the appearance of fairness doctrine because it determined that Galvan's sentence was appropriate. We disagree.

Under the appearance of fairness doctrine, judges should disqualify themselves "in a proceeding in which their impartiality might reasonably be questioned." Sherman v. State, 128 Wn.2d 164, 188, 905 P.2d 355 (1995). "The party asserting a violation of the appearance of fairness must show a judge's actual or potential bias." State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes a reasonable observer knows and understands all the relevant facts." Solis-Diaz, 187 Wn.2d at 540.

Here, Galvan points to no statements or actions by the trial court judge that suggest actual or potential bias. Instead, he generally asserts that the judge "obviously expressed an opinion as to the merits of the original sentence imposed and has already judged it to be appropriate." That the judge believed Galvan's sentence to be appropriate does not indicate bias. We conclude that reassignment to a new judge on remand is not warranted.

19

Legal Financial Obligations

Galvan argues that the DNA collection fee, victim penalty assessment (VPA), crime lab fee, and domestic violence assessment should be stricken from the judgment and sentence. The State does not contest remand to strike the majority of the fees imposed. We remand for Galvan to move the court to strike these fees.

While Galvan's appeal was pending, the legislature amended RCW 7.68.035 to prohibit the imposition of a victim penalty assessment if the court finds that the defendant is indigent at the time of sentencing. See LAWS OF 2023, ch. 449, § 1. The legislature also eliminated the DNA collection fee from RCW 43.43.7541. Under newly amended RCW 43.43.7541, the court must waive any DNA collection fee imposed prior to July 1, 2023 upon a motion by a defendant. Although these amendments did not take effect until after Galvan was sentenced, recent amendments to statutes governing legal financial obligations apply retroactively to matters pending on direct appeal. See State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

Here, the State concedes that the DNA collection fee, VPA, and crime lab fee should be stricken but does not address the domestic violence assessment. We therefore remand for Galvan to move the trial court to strike the agreed upon fees. And because the domestic violence assessment is not mandatory, Galvan may move the trial court to reconsider that fee on remand as well.

Restitution Interest

Galvan asserts that remand is necessary for the trial court to consider whether to strike restitution interest from the judgment and sentence. We agree.

In 2022, the legislature amended RCW 10.82.090, effective January 1, 2023. See LAWS OF 2022, ch. 260, § 12. The newly amended statute permits trial courts to "elect not to impose interest on any restitution the court orders." RCW 10.82.090(2). The court must also consider whether a defendant is indigent before determining whether to impose interest on restitution. RCW 10.82.090(2).

Because this amendment took effect while Galvan's direct appeal was pending, it applies to him. Ellis, 27 Wn. App. 2d at 16. Although the State contends that no case has ever addressed whether restitution interest may be waived on the basis of indigency, this argument ignores this court's recent opinion in Ellis, which directly addressed this issue.

We affirm and remand for the court to consider whether to impose restitution interest. On remand, Galvan may also move the court to reconsider the previously imposed legal financial obligations.

_____
Smith, C.J.

WE CONCUR:

_____
Díaz, J.

_____
Birk, J.